JUNE E. TENNANT, *et al.*

*v.*

HOWARD E. SATTERFIELD, JR.,

ALICE J. OSBORNE, *et al.*,

*etc.*

(No. 13490)

Decided June 24, 1975.

*Alfred R. Putnam* for appellants.

*Herschel Rose* for appellees.

NEELY, JUSTICE:

This is an appeal from the Circuit Court of Marion County, West Virginia to determine whether certain beneficiaries accepted benefits under a will and as a result

were estopped from later contesting the validity of the will. The proponents, at the close of their evidence, objected to the production of evidence by the contestants and moved for a directed verdict on the grounds that the contestants had accepted cashier's checks under the will. The circuit court sustained the object and directed the jury to return a verdict in favor of the proponents. As this Court holds that this case does not present a proper factual situation for the application of estoppel, we must reverse the order of the circuit court and remand the case for a new trial.

This controversy arose as a result of two wills executed by the parents of the parties to this action. The first will, dated November 3, 1961, was a joint will of the father, Howard Ernest Satterfield, Sr., and the mother, Lula Z. Satterfield, which devised and bequeathed all property, real and personal, to the survivor of the two, and after the death of the survivor, to the five children "in equal portions, share and share alike."[1] Howard Ernest Satterfield, Sr. died on May 6, 1969 and the joint will was probated as to him on May 21, 1969.

Two years after the death of her husband, Lula Z. Satterfield executed a second will dated October 11, 1971, which devised all of her real property to her only son, Howard E. Satterfield, Jr. on condition that he pay

---

[1] "SECOND: We hereby give, devise and bequeath unto the one of us surviving the other all property, real, personal or mixed, of whatever nature and wheresoever situate, of the other, in fee simple, absolutely and forever, to be used, enjoyed and disposed of in any manner whatsoever as the survivor may see fit, but should both die, or if when both of us shall be dead and no individual will shall have been made, then the property of both shall be treated as one and the same, and be disposed of as hereinafter provided.

"THIRD: When the survivor of us shall die, or when the both of us shall be dead, all the property belonging to the deceased of us, real, personal or mixed, of whatever nature and wheresoever situate, which the deceased of us may own or have the right to dispose of at the time of his, her or our death, we hereby give, devise and bequeath unto our five children, namely, ALICE J. SATTERFIELD, JUNE TENNANT, HOWARD E. SATTERFIELD, JR., MARTHA M. BERRY, and JACQUELINE SMITH, in equal portions, share and share alike."

the sum of $1,250 to each of his four sisters. The condition was to be a lien on Howard's title to the realty. The remainder of the estate was to be divided equally among all five children.[2] Lula Z. Satterfield died on June 12, 1972 and the second will was probated *ex parte* on June 22, 1972.

In compliance with the provisions of the second will, on November 17, 1972 Howard E. Satterfield, Jr. purchased four cashier's checks from the First National Bank in Fairmont, each made out in the amount of $1,250. Satterfield sent one of the checks by registered mail to each of his four sisters, June E. Tennant, Martha May Evans, Jacqueline V. Smith, and Alice J. Osborne. Three of the sisters received the checks from the postman by signing the registered mail receipts. Alice J. Osborne, on the earlier advice of her attorney, refused to sign the receipt and the check was returned; however, she did not contest the will and is a party defendant. The evidence showed that two of the receipts were signed on November 20, 1972 and the third receipt was signed on November 30, 1972. None of the checks, however, was ever cashed and the three sisters retained possession of the checks until the time of trial when they were introduced into evidence still uncashed.

---

[2] "SECOND: I do hereby give and devise unto my beloved son, HOWARD E. SATTERFIELD, JR., of Fairmont, Marion County, West Virginia, all of my real estate wheresoever situate of which I may own or have the right to dispose of at the time of my death, in fee simple, provided, however, that he pay the sum of ONE THOUSAND TWO HUNDRED FIFTY and 00/100 DOLLARS ($1,250.00), to each of my four (4) daughters, that is to say, the sum of ONE THOUSAND TWO HUNDRED FIFTY DOLLARS ($1,250.00) to ALICE J. OSBORNE, of Fairmont, West Virginia, the sum of ONE THOUSAND TWO HUNDRED FIFTY DOLLARS ($1,250.00) to JUNE E. TENNANT, of Fairmont, West Virginia, the sum of ONE THOUSAND TWO HUNDRED FIFTY DOLLARS ($1,250.00) to MARTHA MAY EVANS, of Fairmont, West Virginia, and the sum of ONE THOUSAND TWO HUNDRED FIFTY DOLLARS ($1,250.00) to JACQUELINE V. SMITH, of Grafton, West Virginia, the said sums being a charge and lien against said real estate until properly paid and this charge released by a Release of record in the office of the Clerk of the County Court of Marion County, West Virginia."

The sisters who signed the receipts were displeased with the provisions of the second will. First, they estimated the value of the real estate devised in the will at approximately $20,000. Therefore, they believed that their brother took a disproportionately large share of the estate under the second will. Secondly, the sisters further believed that Howard had exerted undue influence on their mother to execute the second will during her last days when, they alleged, she was weak and infirm. Consequently, on December 9, 1972, June E. Tennant, Martha May Evans and Jacqueline V. Smith instituted this action to contest the validity of the second will.

At the trial of the case of November 29, 1973, after opening statements by counsel, the proponents introduced testimony that the testatrix, Lula Z. Satterfield, was of sound mind when she executed the second will and that she fully intended to distribute her estate as set forth in that document. The proponents then introduced into evidence the three signed receipts from the registered letters by which Howard Satterfield had sent the cashier's checks to his sisters. At the close of the proponents' evidence, the following events transpired as recounted in the Record at pp. 106-7:

"MR. ROSE: The defendant and proponent, Howard E. Satterfield, Jr., rests.

Thereupon, the following motion was made:

MR. ROSE: May it please the court. Now at the conclusion of the evidence adduced for the proponents, the proponent Howard E. Satterfield, Jr., objects to the introduction of any evidence by the contestants in contest to the will and moves the court to direct the jury to return a verdict that the will of October 11, 1971, is the true will of Lula Z. Satterfield, deceased, on the ground that the contestants have accepted benefits under the will and are therefore estopped from contesting the will.

THE COURT: Sustained.                    Exception.

Whereupon, the jury was directed to and did return the following verdict:

'We, the jury, at the direction of the Court, find for the proponent, Howard E. Satterfield, Jr., in the issue, that the paper writing admitted to probate in the the County Clerk's office on the 22nd day of June, 1972, and bearing date the 11th day of October, 1971, as and for the last will and testament of Lula Z. Satterfield, deceased, and introduced into evidence as "Proponents' Exhibit No. 1-A," is the true last will and testament of Lula Z. Satterfield.'

"Whereupon the trial of this civil action was duly concluded."

The contestants appeal the decision of the trial court and allege that the court erred in holding that they had accepted benefits under the will by signing for the registered mail and holding the checks uncashed, and allege that therefore they were not estopped from bringing this action to contest the validity of that will.

I

The general rule with regard to acceptance of benefits under a will is that a beneficiary who accepts such benefits is bound to adopt the whole contents of that will and is estopped to challenge its validity. *Moore v. Harper*, 27 W. Va. 362 (1886). Acceptance of a beneficial legacy or transfer is presumed, but the presumption is rebuttable by express rejection of the benefits or by acts inconsistent with acceptance. Without acceptance by the intended transferee, the transfer does not occur. *Hardesty v. Corrothers*, 31 F. Supp. 365 (N.D. W.Va. 1940).

In order for estoppel to bar a will contest, it must first be shown that an acceptance occurred, and second, it must be shown that the acceptance was of such a nature as to give rise to equitable considerations which prevent the accepting party from later negating the instrument through which he received benefits. While there is a paucity of case law in West Virginia applying functional criteria to the question of estoppel in will contests, the

following case illustrations from foreign jurisdictions represent a reasonable cross section of the methods by which courts have dealt with acceptance of benefits under a will and a later attempt by the accepting party to challenge the will.

In *Utermehle v. Norment*, 197 U.S. 40, 25 S. Ct. 291, 49 L. Ed. 655 [Wash. D.C.] (1905) an heir accepted a legacy and took possession of a testamentary devise of realty. He collected rents from the real estate for two years, then sold it and retained the proceeds. He gave no indication of his intention to attack the validity of the will until eleven years after probate. The Court held that the heir had acquiesced in the validity of the will for eleven years, profited by his acceptance of the benefits, and, therefore, was estopped to contest the will as the positions of the other parties to the litigation had materially changed due to their reliance on the distribution of the estate eleven years earlier.

Unreasonable delay in bringing a will contest, even if brought within the period allowed by statute, may also estop a contestant from challenging a will after acceptance if the contestant had knowledge at the time of accepting benefits that he would later assail the validity of the instrument. In *Stone v. Cook*, 179 Mo. 534, 78 S.W. 801 (1904) a legatee stated when she accepted her benefits that she took them under protest. When she later instituted her challenge to the will, she announced that she was ready and willing to refund the legacy. The contesting heir had received the major portion of her benefits from the residuum which was determined only after several special legacies had already been paid. Relying on inconvenience and injustice to innocent third parties, the court held that the executor and the special legatees would suffer if the court were to allow the will to be contested after such an acceptance. The court held that the delay was unreasonable in *Stone* in light of the fact that the contesting heir stood by and watched the distribution of the estate knowing all along that she would later contest the will.

The concept of impossibility also may be used to estop a will contest. In *Vance v. Crawford*, 4 Ga. 445 (1848) an heir waited five years to challenge a will by which legacies were distributed and slaves freed. The court held that there was presented no evidence of a justifiable reason for the delay, and therefore, the court barred the will contest because of the inconvenience of recalling legacies and the impossibility of recalling the slaves who had been taken to the free State of Ohio.

Estoppel was *not* available, however, in *In re Miller's Estate*, 159 Pa. 562, 28 A. 441 (1894) where the testator left an estate valued at approximately $500,000, but left one of his six heirs a mere $500 annuity which the heir accepted. The son instituted his challenge within the statutory period and returned the legacy to the executor before prosecuting the appeal. The court held that since the son would be entitled to much more as an heir at law, his receipt of the annuity was not an irrevocable election that would estop him from contesting. There was no unreasonable delay and no personal use of the legacy before it was returned.

Finally, a beneficiary will not be estopped from later attacking or contesting a will when he has accepted benefits without full knowledge of his rights or of the facts and circumstances surrounding the execution of the will if his acceptance has not prejudiced other parties, *Watson v. Watson*, 128 Mass. 152 (1880). In *Watson* the contestant accepted a legacy not knowing of other property to which he was entitled. The court found that, after receiving a legacy, the heir became informed as to the other property, and the court held that since he returned the legacy to the court before the rights of others were affected and gave notice that he elected not to take, estoppel did not apply to his challenge of the will.

Returning to the case *sub judice*, this Court holds that the circumstances surrounding the receipt of the cashier's checks by the three sisters were not such as to establish the preconditions for estoppel. First, the sis-

ters could not have discovered what was being delivered to them by the postman until they signed the receipts. The signing of the receipts was a purely innocent act evidencing no affirmative intention to "accept" the benefits as that term is used in this area of the law.

Secondly, the presumption of acceptance is rebutted by the fact that the sisters never acted in any way inconsistent with their desire to refuse acceptance. They instituted this action contesting the will within ten to twenty days after the checks were delivered to them. They did not cash the checks and therefore they did not receive any immediate benefits from the money like the heir who collected rents from the devised property in *Utermehle, supra,* nor did they delay unreasonably in bringing the contest as the heir in *Stone, supra.*

Third, the sisters did not inflict injustice on any other legatee or devisee as this action was commenced immediately after the brother Howard attempted to realize the devise to him under the second will, and before the respective rights of the parties to the will had been finally settled. The sisters brought the uncashed checks into court as evidence of their intent not to accept the benefits. Holding the uncashed checks in their possession as evidence until the case could be set for trial, a period of about one year, can in no way be construed as personal use of the benefits so as to constitute acceptance.

## II

The proponents assert that the cashier's checks represented absolute payment of the charge laid by the second will against the real estate devised to Howard E. Satterfield, Jr., and base that contention on *W. Va. Code,* 46-3-802 [1963] which provides:

"1. Unless otherwise agreed where an instrument is taken for an underlying obligation

(a) The obligation is *pro tanto* discharged if a bank is drawer, maker or acceptor of the instru-

ment and there is no recourse on the instrument against the underlying obligor: ..."

The proponents argue that a cashier's check is equivalent to cash and that by signing the registered mail receipts the contestants accepted the tender of payment required by the second will to discharge the lien (the underlying obligation) on the property devised to proponent, Howard E. Satterfield, Jr. (the underlying obligor). This provision, however, cannot apply to the facts of this case. Under different circumstances, the signing of a registered mail receipt, the taking possession of a cashier's check, and the holding of that check for one year, could be interpreted as accepting payment for an obligation sought to be discharged by the tender of the cashier's check. But here, the immediacy with which the sisters instituted this action to challenge the second will, their steadfast refrain from cashing the checks or employing the money for personal use, and their relinquishment of the checks to their attorney for use as evidence of their desire to refuse acceptance so that they might contest the will, all militate against a holding by this Court that the acts of the sisters constituted acceptance of a benefit under the will. Had cash been sent in a sealed envelope and treated in the same manner with regard to conservation, the same result would obtain.

Accordingly, the judgment of the Circuit Court of Marion County is reversed and the case is remanded for a new trial.

*Reversed and remanded.*